FILED
2018 Nov-06  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| SHANNON HAMNER, | \| |
| | \| |
| **Plaintiff,** | \| |
| | \| |
| v. | \|        CIVIL ACTION NO. |
| | \| |
| TUSCALOOSA COUNTY | \| |
| SCHOOL SYSTEM, WALTER | \|        _____ |
| DAVIE, ALLISON MAYS AND | \| |
| CLIFTON ("CRAIG") HENSON | \| |

## COMPLAINT

Plaintiff Shannon Hamner ("Hamner") brings this action to remedy and seek redress for flagrant and unlawful sex discrimination and retaliation in her former employment and the termination of her employment with Defendant Tuscaloosa County School System ("TCSS") in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and 42 U.S.C.§ 1981.  She also brings this action to remedy retaliation (unlawful under § 1981) on the parts of the individual Defendants – TCSS' superintendent Walter Davie; its human resources director Allison Mays and Clifton ("Craig") Henson, who was the principal at the school at which Plaintiff worked, each of whom personally contributed to the sexually and gender-hostile work environment in which Plaintiff, and each of whom retaliated against Plaintiff

in violation of § 1981.  Defendants Davie and Mays heavily participated in, indeed orchestrated, the retaliation (unlawful under § 1981) against Plaintiff.

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the federal (Title VII and § 1981) claims in this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(1)(A) & (f)(3).  The Court has supplemental jurisdiction over the State law claims asserted against Defendant Henson pursuant to 28 U.S.C. § 1367.

2.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as Hamner worked for Defendant TCSS, and the events giving rise to Hamner's claims occurred, in this District.

## II.   PARTIES

3.    Plaintiff Shannon Hamner is a female individual who formerly worked for and was employed by Defendant TCSS as a school counselor.

4.    Defendant TCSS is the agency of Tuscaloosa County, Alabama that operates Tuscaloosa County's School System, including Hillcrest Middle School ("HMS") and Collins-Riverside Middle School ("CRMS"), both of which are schools at which TCSS employed Hamner and where Hammer worked, as a school counselor (at HMS and next (and last) at CRMS).  At all times material to this action, TCSS is and was

     a.      a public (local governmental) employer that employed more than 15 employees, and an "employer" governed by and subject to suit under Title VII;

     b.      and a "person" governed by and subject to suit under § 1981.

5.    Defendant Allison Mays ("Mays) is an individual employed by TCSS as its human resources director.  At all times material to this action, Mays was and acted as an agent and employee of TCSS. Mays is a "person" governed by and subject to suit personally under § 1981.

6.    Defendant Clifton ("Craig") Henson ("Henson") is an individual employed by TCSS as its principal of CRMS.  Henson is male.  At all times pertinent to this action, Henson was and acted as an agent and employee of TCSS.  Henson is a "person" governed by and subject to suit personally under § 1981.

7.    Defendant Walter Davie is an individual employed by TCSS as its Superintendent, the highest-ranking position of employment with TCSS. Davie is male.  At all times pertinent to this action, Davie was and acted as an agent and employee of TCSS.  Davie is a "person" governed by and subject to suit personally under § 1981.

III.   **FACTS**

A.   **Satisfaction of Administrative Requisites**

8.     Hamner satisfied all administrative requisites for bringing this action under Title VII.

9.     Hamer filed a charge of sex/gender discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the discrimination and retaliation of which she complains.  A copy of that EEOC charge is attached hereto as Exhibit A.

10.     Hamner files this action within 90 (ninety) days of receipt of her right-to-sue notice from the EEOC.  A copy of that notice is attached hereto as Exhibit B.

B.   **Background:  Hamer's employment at Hillcrest Middle School and Plaintiff's prior lawsuit here called "Hamner I"**

11.     Before her employment was terminated, Hamner was a decades-long employee of TCSS.  She began her employment with TCSS in 1988.

12.     At all times material to this action, Hamner is and has been a nationally-certified school counselor and licensed to work as a counselor in Alabama schools by Alabama's Department of Education.

13.     Hamner worked for TCSS as a school counselor, including working for many years as the school counselor of TCSS's HMS.

14.     During her employment as a school counselor for TCSS at HMS, Hamner was subjected to and the victim of repeated disgusting lewd, even obscene,

sexual harassment perpetrated by another TCSS' employee – a coach who worked and was employed by TCSS at HMS.  Such harassment included, without limitation, that coach exposed his penis to Hamner and tried to force her to touch it while he made lewd statements to her about it.  Hamner frantically escaped from that situation physically unharmed but emotionally shaken.  Thereafter, that harasser coach continued his sexual harassment of Hamner in and during their respective employment at HMS.

15.    Hamner complained to TCSS' then-human resources director (Defendant Mays' predecessor in that position) about the above-described sexual harassment, filed an EEOC charge about it, and ultimately filed a lawsuit about it, in which she complained it violated Title VII and § 1981.  *See Hamner v. Pruitt, TCSS, et al.*, Civil Action No. 7:15-cv-00925-JHE, United States District Court for the Northern District of Alabama at Docs. 1, 25-1, 25-2.  Hereafter, that lawsuit is referenced as "Hamner I."

16.    During the course of Hamner I, specifically on the record during Hamner's counsel's deposition of a witness in that case – a deposition of a HMS teacher – the teacher explicitly threatened to get an attorney and sue Hamner for getting that teacher involved as a witness in that case.

17.    That teacher's threat was in retaliation for Hamner pursuing her protected lawsuit in Hamner I.

18.    In response to that threatened retaliation, Hamner's counsel asked TCSS through TCSS' counsel to restrain that teacher's retaliatory threat to sue Hamner, but TCSS' counsel, and TCSS, did nothing to restrain the teacher's retaliatory threat and thereby ratified it.

19.    Eventually, Hamner and TCSS and the individual defendants, including the alleged sexual harasser in Hamner I, settled that case.

20.    The settlement does not diminish the fact the retaliation against Hamner for her protected lawsuit in Hamner I started during the pendency of Hamner I and continued thereafter through Hamner's subsequent suspension and termination from employment and continued even after her employment was terminated, as described below.

21.    As a part of that settlement of Hamer I, all parties agreed to various terms the parties are supposed to keep confidential.

22.    In disregard of and disdain for Hamer's rights under the settlement agreement in Hamner I, Defendant TCSS and Mayes had one of the individual Defendants in Hamner I attend a work meeting in the same room in which Hamner was attending the meeting.

23.    Their attendance of a work meeting in the same room was in blatant disregard to Hamner's right to not have to work in the same room with the individual

defendants in Hamner I, which was a right on which Hamner insisted to avoid further abuse and mistreatment by and exposure to the individual defendants in Hamner I.

24.     This evidenced Defendants Mays' and TCSS' utter disdain of and disregard for Plaintiff's rights.

25.     Related to but not part of settlement agreement, Hamner was permitted to transfer to another TCSS' school at which the alleged harasser and the individual defendants in Hamner I did not work – CRMS.

26.     While the parties to Hamner I were settling that case, Defendant Walter Davie was already anticipating retaliating against Hamner by having her fired from her TCSS' employment at CRMS.

27.     As part of anticipating that retaliation, Defendant Davie carefully made sure that Plaintiff's transfer to and employment at CRMS was **not** made part of the agreement by which Hamner, TCSS and other parties settled Hamner I.

28.     Thereby, Defendant Davie made sure the agreement by which Hamner I was settled did not restrict his and TCSS' ability to retaliate against Plaintiff by firing her because of Hamner's statutory-protected conduct, which included her internal complaint, her EEOC charge and the lawsuit Hamner filed in Hamner I about the sexual harassment she suffered while she was employed and worked at HMS.

29.    In setting this retaliatory trap, Defendant Davie lured Plaintiff toward the trap by requesting Hamner to meet with him in his office, where and during which Davie explicitly told Plaintiff he would "not pull the rug from underneath" her job at CRMS and her job at CRMS would "be safe" until Plaintiff retired.  Those statements were falsehoods designed to hide Defendant Davie's true retaliatory intentions.

30.    To facilitate his retaliatory plan for Plaintiff after she transferred to another school – CRMS – Defendant Davie arranged for Plaintiff's transfer to a counselor's position at CRMS in a way that violated TCSS's policies and procedures regarding transfers from a job at one TCSS school to a job at another TCSS school.

31.    Hamner might be remiss if she did not also allege what resulted from TCSS's investigation of the sexual harassment about which she complained while she was employed at HMS:

    a.    TCSS determined the harasser had, if fact, sexually harassed Hamner, for which TCSS gave the harasser only a written counseling memorandum;

    b.    As to the harasser exposing his penis, TCSS' then-human resources director claimed TCSS was not responsible for doing anything about that because the conduct had occurred off school property and on the harasser's and Hamner's own time while the harasser and Hamner were off

8

and not at work, which was a *mea culpa* disclaimer that was contrary to law. This evidences the extent to which TCSS disregarded Hamner's rights to be free of sexual harassment by a co-employee and TCSS' disdain of and disregard toward Hamner's complaints about sexual harassment and her right to be free from sexual harassment from other TCSS' employees;

      c.    In Hamner I, TCSS' then-human resources director gave sworn testimony that TCSS' human resources policy that purported to prohibit sexual harassment was **not** a 'zero tolerance" policy.  Immediately after that testimony, he then demonstrated himself unable of testify to how much sexual harassment TCSS was willing to tolerate.  This evidences that TCSS is willing to tolerate sexual harassment of its employees in general and Hamner in particular.

## C.    TCSS' and Henson's sexually-hostile work environment at CRMS

32.    In her job as a counselor at CRMS, plaintiff's "boss" at the school was the school's principal, Defendant Henson.

33.    Defendant Henson made Plaintiff's work environment at CRMS a sexually-hostile work environment, which included Henson engaging in creepy, stalking actions toward Plaintiff based on and because of her gender and Henson engaging sexually inappropriate conduct toward, and denigrating to, other females because of their sex.

34.    As to other females:

a.    When talking to a buxom female teacher who taught at CRMS, Defendant Henson, instead of looking the teacher in her eyes while talking to her, stared at the teacher's breasts, which made the teacher very uncomfortable.

b.    That teacher complained to Hamner about Henson staring at her breasts while he talked to her, which was a complaint Plaintiff included in her own complaint about Henson's sexual harassment, which was a complaint Plaintiff made to Defendant Mays, who at that time had become and was TCSS' director of human resources;

c.    Henson otherwise denigrated women, including his referring to a particular female parent of students at CRMS by stating exactly or words to the effect: "We go to the same church.  She drops her pants all the time and is responsible for half of the divorces in our church."

d.    TCSS was aware of a complaint about what is described in subparagraph (c) above, in that TCSS received a letter complaining about Henson denigrating that female parent that way.  Despite knowing of the complaint about it, TCSS did nothing to stop such sexually-hostile and sexually denigrating conduct by its principal, Defendant Henson.

e.      During her employment at CRMS, Plaintiff was aware of and knew about Henson's sexually-hostile treatment of other women as described above, and Plaintiff was also aware TCSS failed to take prompt effective remedial action to stop Henson's sexually-hostile and denigrating treatment of women.

f.      Henson did not stare at the breasts of male teachers while Henson talked to them.

g.      Henson did not describe male parents of students as dropping their pants all the time and being responsible for divorces.

35.     As to Plaintiff, Henson exhibited sexually creepy and stalking behavior toward Plaintiff based on Hamner's sex by, among other things:

a.      Henson drove the wrong way on a one-way street on school property while staring at Plaintiff and proceeded to pull his car beside where Plaintiff was standing, stopped there without getting out of his car and without rolling down a car window while he continued to stare at Plaintiff the entire time before he proceeded and drove away without offering anything that would legitimately explain this bizarre stalking behavior;

b.      Henson followed Plaintiff on occasions when she left school property (*e.g.*, when she left for lunch) and followed her back to school property when she returned to it;

      c.     While Plaintiff was in her car parked on school property, Henson pulled the front of his car behind one of the rear tires of Plaintiff's car and sat there in his car in that position for minutes staring at Plaintiff the entire time. Plaintiff was too afraid to get out of her car, Henson did not get out of his car before he eventually drove away without getting out of his car and without indicating anything that would legitimately explain this bizarre stalking behavior;

      d.     Henson otherwise stared at Hamner when they both were outside of CRMS.

      e.     Despite not wanting to, Henson insisted that Plaintiff ride with him in his car to go to a meeting off CRMS property;

      f.     Henson repeatedly invaded Plaintiff's personal space and put his hand on her without her consent and with a suggestive look on his face.

36.     Henson did not treat male employees in the ways he treated Hamner as described above.

37.     Henson denigrated Hamner in other ways based on her sex, her refusal to acquiesce to and go along with his touching sexual suggestive advances, and/or her complaint about his sexual harassment of her, including the following.

    a.     Hamner was CRMS' "building test coordinator," a designation that made Hamner responsible for planning and administering annual standardized testing of students at CRMS.

    b.     As part of the process of fulfilling those "building test coordinator" responsibilities, Hamner was supposed to and should have given a presentation to CRMS' teachers and administrative employees about standardized testing that was going to be done at CRMS.

    c.     Henson excluded Hamner from that presentation process.

    d.     Hamner complained internally about Henson excluding her from that process, which Henson continue to do even after TCSS' central office member of management responsible for standardized testing throughout TCSS' school system, who was female, counseled Henson that he had to include Hamner in the process. It took multiple occasions of that central office member of management talking to Henson to get him let Hamner do what she was supposed to do as the "building test coordinator" at CRMS.

38.    Henson did not exclude TCSS' male employees at CRMS from participating in the planning and administration of standardized testing at CRMS.

39.    Henson did not exclude TCSS' employees who had not engaged in statutory-protected conduct from participating in the planning and administration of standardized testing at CRMS.

40.    Henson had no legitimate non-discriminatory and non-retaliatory for excluding Hamner from fulfilling her "building test coordinator" responsibilities and from the process of planning and administering standardized student testing at CRMS.

41.    Henson also treated an African-American female employee in a denigrating way as follows:

      a.    The female employee was an African-American teacher who violated TCSS' standardized testing policies by talking on a cell phone while she was supposed to be monitoring students who were taking standardized tests while the teacher was on the phone.

      b.    When Henson learned about the above-described violation of policy, Henson directed Hamner to not report it to standardized testing authorities/management in TCSS' central office for Henson's stated reason and in Henson's words: "It would become a 'black-white' thing," meaning it would become a racial dispute.   Henson assumed the African-American female teacher would claim race discrimination if her policy violation was reported to standardized testing authorities/management in TCSS' central office.

      c.    Henson did not treat male African-American employees that way, or express that racist attitude toward them, in response to their violations of TCSS' policies.

## D.    Defendant Mays' and TCSS' ineffective and insufficient handling of complaints about Henson"s sexual discrimination toward and denigration of women

42.    Hamner complained about Henson's creepy, stalking conduct and other sexual harassment to Defendant Mays to no avail.

43.    Mays responded in part by telling Hamner to report her complaint about Henson's creepy, stalking conduct to the police, which Hamner did.

44.    Mays falsely criticized Hamner about Hamner supposedly not promptly reporting her complaint to the police after Mays instructed Hamner to do so, even though Hamner in fact had promptly reported her complaint to the police after Mays instructed Hamner to do so.

45.    To Hamner's knowledge, Mays did not conduct a reasonably sufficient investigation of Hamner's complaints.

46.    Indeed to Hamner's knowledge, Mays did not did not conduct any investigation whatsoever about Hamner's complaints about Henson's sexual harassment and creepy, stalking conduct.

47.    Mays certainly never told Hamner the results of any investigation Mays may claim she conducted about Henson's sexual harassment and creepy, stalking conduct.

48.    Mays, as TCSS' human resources director, was particularly incapable of reasonably investigating Hamner's complaint, in that Mays has demonstrated a willingness to use lewd and vulgar language and engage in lewd and vulgar behavior herself, even in a public setting.  Specifically, Mays has:

a.     said the "F-word" and 'titty," "ass," and "son- of-a-bitch" in a very public-setting; and in the same public setting

b.     tried to "make fun" out of a scenario in which a man had his genital area pressed against her rear-end while Mays was bent over, by asking what part of the man's body she felt bulging against her (implying she was feeling the man's penis in an aroused state), only to have the man reply it was a hernia.

c.     the foregoing was witnessed by many witnesses and is documented;

d.     an employee can have no faith that a human resources director who engages in the conduct described above will give serious attention to a sexual harassment complaint like those made about Henson; and

e.     Hamner did not know the foregoing (the facts described in subparagraphs (a) and (b) above about Mays) at the time Hamner complained about Henson to Mays.

49.     Hamner's complaints about Henson was about conduct Hamner reasonably believed violated Title VII's prohibitions of gender discrimination and sexual harassment and Title VII's and § 1981's prohibitions of retaliation.

50.     In response to Hamner's statutory-protected complaint about Henson,

a.     all Defendants failed to take prompt, remedial action to eliminate the sexually-hostile environment in which Hamer had to work at CRMS and Henson's denigrating treatment of women; and

b.     instead, all Defendants retaliated against Hamner.

51.     With knowledge of her statutory-protected internal complaint and her statutory-protected conduct of filing an EEOC charge and Hamner I,  all Defendants participated in a process by which Hamner was suspended from her counseling job at CRMS (which Defendants called placing Hamner on "administrative leave") with pay pending their purported investigation into Hamner's "504 plans" not just at CRMS but also Hamner's previous "504 plans" at HMS.

52.     The false and pretextual nature of this so-called investigation was apparent from the start, in that:

a.      Hamner was give written notice, signed by Defendant Davie and prepared by or with the input of Defendant Mays, that the investigation of Hamner's "504 plans" at CRMS included "504 plans" for a year that pre-dated Hamner's employment at CRMS and the preparation of which Hamner had not been responsible when they were prepared, but were plans for which Hamner's predecessor at CRMS had prepared (or not) for that year and had been responsible;

b.      Hamner's "504 plans" at Hillcrest Middle School had been previously submitted to Greg Hurst, the member of TCSS' management at TCSS' central office who was responsible for overseeing whether the "504 plans" of TCSS' schools, including HMS, were proper and complied with TCSS's "504 plan" policies and requirements.  Hurst had previously **reviewed and approved** HMS' "504 committee's" "504 plans" for students at HMS that Hamner and others on HMS' "504 committee" prepared and were responsible.

c.      Indeed, Hurst had repeatedly complimented and even praised Hamner for the "504 plans" Hamner submitted to him annually during her employment at HMS and in her capacity as chair of HMS' "504 committee."

d.      Hurst had repeatedly stressed that a "504 plan" was the responsibility of the school's "504 committee" as a whole and every member

of the committee and was not the responsibility of only the "504 committee's" chair.

e.    Nonetheless, the other members of HMS' and CRMS' respective "504 committees" were not suspended (were not placed on "administrative leave" or otherwise treated adversely), and were not investigated for the "504 plans" they developed in their service on their respective school's "504 committee."

f.    Of the members of the respective 504 committees of HMS and CRMS,

i.    only Hamner was singled out and suspended (placed on administrative leave) for investigation, and

ii.    only Hamner had engaged in the statutory-protected conduct in which she had engaged as described herein (specifically, having made an internal complaint about sexual harassment, filing an EEOC charge and filing a lawsuit under Title VII and § 1981).

53.    "504 plans" are plans prepared by each TCSS' school for the school's "504" students, who are students who have special education needs the school must address in a written plan. Within schools within TCSS' school system, preparation of "504 plans" are the responsibility of the school's "504 committee," which

typically consists of the school's counsel(s), its principal or an assistant principal, and the school's nurse (if any) and perhaps a teacher at the school. One member of the "504 committee" is designated as the chair of the committee.

54. Hamner served as the chair of the "504 committee" when she worked as a counselor at HMS and later (next) at CRMS.

55. For her work as a 504 committee chair, Hamner receive a relatively small stipend of extra pay, which was a stipend less than the amount paid as a stipend to TCSS' school employees for holding the position of "fishing coach."

56. During Defendants' investigation of Hamner and her suspension, defendants prohibited Hamner from:

> a. from having contact with TCSS employees, students and the parents of TCSS' students;
>
> b. from coming onto TCSS' property; and
>
> c. her access to TCSS' e-mail system was promptly terminated.

57. The foregoing denied due process to Hamner and prevented her from contacting witnesses who and obtain evidence that would support her claims and her defenses to Defendants' accusations against Hamner and her defenses to the charges Defendants claimed they were investigating, which included evidence in the form of e-mails on TCSS' e-mail system that confirmed Hamner's defenses to Defendants' s accusations and charges.

58.     Defendants did not treat others on HMS' and CRMS' respective "504 committees" the way they treated Hamner.

59.     Instead, they singled-out Hamner and treated her the way they treated her because of her sex and in retaliation for her statutory-protected conduct described herein.

60.     In so doing, Defendants discriminated against Hamner based on her sex.

61.     In so doing, Defendants also retaliated/discriminated against Hamner for her statutory-protected conduct

62.     Based on the result of their pretextual investigation that singled only Hamner out, all Defendants recommended that Hamner's employment be terminated.

63.     Defendant Davie made that a formal recommendation to TCSS' board.

64.     After holding a hearing, TCSS' board "rubber-stamped" and accepted Defendant Davie's recommendation and thereby terminated Hamner's employment with TCSS.

65.     All the recommendations described above were based on and made because of both Hamner's sex/gender and in retaliation/discrimination for Hamner's statutory-protected conduct

66.     Upon Hamner's information and belief, TCSS has never terminated an employee because of conduct allegedly committed in connection with a "504 plan" for any student at a TCSSS school.

67.     This despite that Hamner's predecessor as chair of the "504 committee" at CRMS:

a.      failed to prepare any "504 plan" for CRMS' students for which a "504 plan" was required by both TCSS' policies and "504 law"; and

b.      for some CRMS' students for which a "504 plan" was required, Hamner's predecessor as chair of the "504 committee" at CRMS prepared "504 plans" that were not on TCSS' designated "504 plan" forms bt were hand-written on various loose pages from a spiral notebook and failed to meet even basic and rudimentary requirements of a "504 plan";

c.      nonetheless, Hamner's predecessor and other members of CRMS' "504 committee" were not disciplined or otherwise held accountable for their "504 committee's defective "504 plans."

d.      they had not engaged in the statutory-protected conduct in which Hamner had engaged as escribed above, and at least one of them (Henson) was a male

68.    Defendant Mays later contended in sworn testimony that Hamner's conduct as a "504 committee" member violated "504 law," which was a position Defendant Davie and TCSS' counsel eschewed at the hearing before TCSS' board.

69.    Defendants' inconsistent positions as described above (68) demonstrates the pretextual nature of Defendants' treatment of Plaintiff.

70.    At the hearing before TCSS' board, Defendant Davie and TCSS falsely attempted to fault Hamner for allegedly modifying a TCSS' "504 plan" official form, despite that Hamner did not modify the form at issue but had merely completed it and that despite:

    a.    Hamer's predecessor failed to use TCSS' "504 plan" official forms as described in paragraph 67 above;

    b.    a male counselor who chaired and was a member of the "504 committee" at another TCSS school did not use TCSS' "504 plan" official forms, but instead used forms of his own creation.

    c.    that male counselor like Hamner's predecessor counselor and chair of the "504 committee" at CRMS, was not disciplined or otherwise adversely held accountable for not using or altering TCSS' "504 plan" official forms, and the male employee like Hamner's predecessor had not engaged in statutory-protect conduct.

71.    Again, Defendants singled-out Hamner and treated her the way they treated her because of her sex and in retaliation for her statutory-protected conduct described herein.

72.    Defendants sex discrimination and retaliation against hamner did not end with the termination of her employment.

73.    Thereafter, Defendants Davie, Mays and TCSS took the unprecedented step of complaining about Hamner to Alabama's Board of Education ("ABE") in an effort to get that Board to revoke Hamner's license to work as a counselor in Alabama schools.

74.    ABE recognized this was unprecedented and refused to do so.  Instead, ABE merely required that Hamner explain her side about what happened and required her to undergo 504 training in the form of reading ABE's manual on 504 requirements.   Before that, Hamner's only official 504 training had been 6-documented hours of total training provided by TCSS, none of which prohibited the conduct based on which TCSS pretextually terminated Hamer's employment. ABE's 504 manual also did not prohibit the conduct based on which TCSS pretextually terminated Hamer's employment

## IV.   COUNT I- GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

75.    Hamner reasserts all allegations above.  This is not boilerplate, but to eliminate needless repetition

24

76.    TCSS suspended and terminated Hamer's employment and otherwise discriminated against Hamner because of and on the basis of her female gender.

77.    Defendants' stated purported reasons for their treatment of Hamner were false and pretextual reasons to hide their true gender discriminatory motive.

78.    Said gender discrimination proximately caused damages to Hamner, including without limitation, mental anguish and lost back pay and benefits and other pecuniary damages.

79.    Wherefore, Hamner demands judgment against TCSS in the form of:

a.    an award of compensatory damages in an amount to be determined by the jury;

b.    an award of back pay and benefits plus pre-judgment interest in amounts to be determined by the jury;

c.    an order that reinstates Hamner's employment with TCSS, or preferably in lieu of reinstatement, an award of front pay and benefits for a period of six years in amounts to be determined by the jury;

d.    an award of punitive damages in an amount to be awarded by the jury;

e.    a declaratory judgment that TCSS discriminated Hambner based on and because of her gender;

f.      an injunction that enjoins TCSS and its agents and employees from further discriminating against Hamner based on or because of her gender in violation of Title VII;

g.      an award of Hamner's reasonable attorneys' fees and expenses, plus costs.

## V.    COUNT I- A SEXUALLY-HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

80.    Hamner reasserts all allegations in paragraphs one through seventy-four above.  This is not boilerplate, but to eliminate needless repetition.

81.    Defendants created and maintained a sexually-hostile environment in which Hamner had to work for TCSS at CRMS, which culminated in the suspension and ultimately the termination of Hamner's employment as described above.

82.    After receiving complaints about the sexually-hostile environment, defendants failed to take prompt remedial measures to eliminate it.

83.    The sexually-hostile environment constituted discrimination against Hamner based on and because of sex.

84.    The sexually-hostile environment constituted discrimination against Hamner based on and because of sex in violation of Title VII.

85.    Said sex discrimination proximately caused damages to Hamner, including without limitation, mental anguish and lost back pay and benefits and other pecuniary damages.

26

86.     Wherefore, Hamner demands judgment against TCSS in the form of:

a.      an award of compensatory damages in an amount to be determined by the jury;

b.      an award of back pay and benefits plus pre-judgment interest in amounts to be determined by the jury;

c.      an order that reinstates Hamner's employment with TCSS, or preferably in lieu of reinstatement, an award of front pay and benefits for a period of six years in amounts to be determined by the jury;

d.      an award of punitive damages in an amount to be awarded by the jury;

e.      a declaratory judgment that TCSS discriminated Hamner based on and because of sex;

f.      an injunction that enjoins TCSS and its agents and employees from further discriminating against Hamner based on or because of sex in violation of Title VII;

g.      an award of Hamner's reasonable attorneys' fees and expenses, plus costs.

## VI.   COUNT III-RETALIATION IN VIOLATION OF TITLE VII

87.     Hamner reasserts all allegations in paragraphs one through seventy-four above.  This is not boilerplate, but to eliminate needless repetition.

88.    Defendants retaliated/discriminated against Hamner, including in connection with its investigation of her and TCSS' suspension and eventually its termination of her employment and otherwise retaliated/discriminated against Hamner based on her protected opposition to employment practices prohibited by Title VII and based on her participation in conduct protected by Title VII.

89.    Said retaliation/discrimination was a "but for" cause and a substantially-motivating cause of Defendants' treatment of Hamner, and it caused damages to Hamner, including without limitation, mental anguish and lost back pay and benefits and other pecuniary damages.

90.    Defendants' stated purported reasons for their treatment of Hamner were false and pretextual reasons to hide their true retaliatory/discriminatory motive.

91.    Wherefore, Hamner demands judgment against TCSS in the form of:

a.    an award of compensatory damages in an amount to be determined by the jury;

b.    an award of back pay and benefits plus pre-judgment interest in amounts to be determined by the jury;

c.    an order that reinstates Hamner's employment with TCSS, or preferably in lieu of reinstatement, an award of front pay and benefits for a period of six years in amounts to be determined by the jury;

      d.     an award of punitive damages in an amount to be awarded by the jury;

      e.     a declaratory judgment that TCSS retaliated/discriminated Hamner based on her conduct protected by Title VII;

      f.     an injunction that enjoins TCSS and its agents and employees from further retaliating/discriminating against Hamner based on or because of her conduct protected by Title VII;

      g.     an award of Hamner's reasonable attorneys' fees and expenses, plus costs.

## VII. COUNT IV-RETALIATION IN VIOLATION OF § 1981

92. Hamner reasserts the same retaliation claim she asserts in Count III above against all Defendants under § 1981, for which she seeks the same relief requested in Count III above against each Defendant separately and severally.

93. Hamner asserts this 1981 Count this way for the sake of brevity and to avoid needless repetition.

## VIII. COUNT V-BATTERY AGAINST HENSON AND TCSS

94. Hamner reasserts all allegations about Henson in paragraphs one through seventy-four above. This is not boilerplate, but to eliminate needless repetition.

95.    Each time Henson touched Hamner, it was not consensual on Hamner's part, and each touching constituted a battery on Hamner.

96.    These batteries were intentional torts.

97.    Said batteries proximately caused damages to Hamner, including without limitation emotional distress and mental anguish.

98.    Wherefore, Hamner demands judgment against Henson and TCSS, separately and severally in the form of:

      a.    Awards of compensatory and punitive damages in amounts to be determined by the jury, plus costs.

### ***HAMNER DEMANDS A TRIAL BY JURY***

s/ *Barry V. Frederick*

Barry V. Frederick (ASB-1979-C65B)
Attorney for Plaintiff Shannon Hamner

OF COUNSEL:

THE FREDERICK FIRM
5409 Trace Ridge Lane
Birmingham, Alabama 35244
(205) 739-0043 phone
(205) 739-0044 fax
Barry@frederickfirm.net

*Plaintiff will have Defendants served by certified mail or by hand.

30